Maude T. Fearing v. Commissioner.
Fearing v. Commissioner
Docket No. 84661.
United States Tax Court
T.C. Memo 1962-148; 1962 Tax Ct. Memo LEXIS 159; 21 T.C.M. (CCH) 800; T.C.M. (RIA) 62148; June 22, 1962
*159 Gordon D. Simons, Esq., for the petitioner. F. Stewart Elliott, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income tax of petitioner and Estate of Edward J. Fearing, Deceased, Maude T. Fearing, Surviving Wife, for the taxable years 1953 and 1954 in the amounts of $1,299.46 and $979.75, respectively. A petition was filed in the name of Estate of Edward J. Fearing, Deceased, Maude T. Fearing, Surviving Wife, and Maude T. Fearing. Respondent moved to dismiss as to the Estate of Edward J. Fearing, Deceased, Maude T. Fearing, Surviving Wife, and to change caption to "Maude T. Fearing, Petitioner," on the ground that the Court lacked jurisdiction as to the Estate of Edward J. Fearing, Deceased, since the petition was not signed or verified by a fiduciary having authority to act in behalf of the estate. Respondent's motion was granted by this Court. Some of the issues raised in the petition have been conceded by petitioner, leaving for our decision the following: 1. Whether petitioner is entitled to dependency credit exemptions for her grandson and granddaughter in each of the years *160 1953 and 1954. 2. Whether petitioner is entitled to deductions for charitable contributions in excess of the amounts allowed by respondent in his notice of deficiency for each of the years 1953 and 1954. 3. Whether petitioner is entitled to deductions for medical expenses in excess of the amount allowed by respondent in his notice of deficiency for each of the years 1953 and 1954. 4. Whether petitioner is entitled to a deduction for a casualty loss because of damage to the steps of the front porch of her house and water damage in the year 1953. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, Maude T. Fearing, filed a joint Federal income tax return with her husband, Edward J. Fearing, for each of the calendar years 1953 and 1954 with the district director of internal revenue for the district of Minnesota. Petitioner and her husband, during the years 1953 and 1954, resided in Hibbing, Minnesota. Subsequent to 1954 Edward J. Fearing died, and petitioner is now a widow and resides in Minneapolis, Minnesota. During the years 1953 and 1954 petitioner's husband was general superintendent of mines for Pickands-Mather & Company *161 at Hibbing, Minnesota, and received a salary from that company of $24,167.40 in 1953 and $18,451.60 in 1954. During the years 1953 and 1954, petitioner and her husband provided, without rental charge therefor, a house in Minneapolis, Minnesota, for the use of their divorced daughter, Mary June Krecklow, and her two children, Maudie and Billie Krecklow. The house was an old house and in poor repair but was in an excellent neighborhood. The rental value of the house during the years 1953 and 1954 was $125 a month. In addition to supplying their daughter and her children with a house, petitioner and her husband gave their daughter $100 a month which was sent to her by checks in the amount of $50 twice each month. They also occasionally sent additional amounts of money when unusual expenses occurred and provided clothing for their daughter and the children, Billie and Maudie. The value of the clothing furnished for the two grandchildren by petitioner and her husband was $600 in each of the years 1953 and 1954. During the years 1953 and 1954 Mary June received $100 per month from her former husband for the support of Billie and Maudie. In addition to the monthly payments, he sent *162 her $78 in 1953 and $70 in 1954. During the year 1953 Mary June had income from employment as a secretary and part-time employment as a waitress in the total amount of $2,542.96, and in the year 1954 Mary June had income from these same sources in the amount of $2,290.55. The money given by petitioner and her husband to Mary June was not specifically designated as to use but the use of it was left to Mary June's discretion. Mary June used portions of this money to pay heat bills; some of it was used in 1953 and 1954 to replace the hot water heater and the kitchen sink in the house in which she lived. During the years 1953 and 1954 Mary June had babysitters who lived in the house with her and the children. She furnished the babysitters with room and board and paid them some salary. The babysitters took care of the children while Mary June worked, and also generally helped Mary June. Mary June spent as little of her available funds for her own personal use as she reasonably could and still perform her work. She commingled all of the moneys which she received and except for the minimum necessary for her personal support, spent the balance on maintaining the household, feeding *163 and paying the babysitters, and providing for her children, Billie and Maudie. Billie and Maudie spent approximately 6 weeks in 1953 and 7 to 8 weeks in 1954 with their father's parents in Milwaukee, Wisconsin. During these periods the support and maintenance of Billie and Maudie in their paternal grandparent's home was provided by those grandparents. In the year 1953 transportation from Minneapolis to Milwaukee was also provided by the children's paternal grandparents. When Maudie and Billie visited their father, he gave them money. Petitioner and her husband grew up in Little Falls, Minnesota, and whenever they returned there to visit, petitioner's husband would make a donation to the church which he had attended in his youth. Petitioner's husband regularly attended the Catholic church in either Hibbing, Minnesota where they lived, or Virginia, Minnesota, a city nearby. On some occasions petitioner accompanied her husband to the Catholic church in Hibbing and the Catholic church in Virginia. Petitioner's husband made contributions to the church which he attended on Sunday. Petitioner generally attended the Presbyterian church in Hibbing and when she did she made a donation. The *164 donations by both petitioner and her husband were made in cash and placed on the collection plate. Petitioner's husband was on the Boy Scout board and in 1953 and 1954 he contributed to the Boy Scouts. Petitioner and her husband also made some contributions during the years 1953 and 1954 to the polio fund, the heart fund, the Salvation Army, the Red Cross, and the Community Chest. Petitioner was on the Red Cross board in Hibbing. Petitioner's husband suffered from high blood pressure beginning around 1940 or 1941, and in 1950 suffered the first of a series of cerebral hemorrhages. Between that time and 1956 he had several additional cerebral hemorrhages. Petitioner's husband also suffered from arterial sclerosis that affected his brain and by 1955 or 1956 the brain damage was such that he had periodic disorientation, confusion, and very marked emotional instability. Petitioner was aware of her husband's progressive physical and mental deterioration which was evidenced by poor memory, loss of weight, difficulty in keeping up with his work, and inability to remember directions. During the years 1953 and 1954 petitioner's husband was under regular medical care including trips to *165 Duluth, Minnesota approximately once a month to consult the medical specialists at the Adams Clinic. Petitioner's husband was hospitalized several times during these years. During the years 1953 and 1954 petitioner and her husband paid to a dentist in Duluth a total of at least $200 for dental services for themselves. In 1953 the bricks fell apart on the steps of petitioner's Minneapolis house in which her daughter, Mary June, lived. Petitioner was not living in the house at the time and did not know when the damage occurred, but the man who came to repair the damage told her that it was from frost. During the year 1953 there was a windstorm which blew down a tree and broke a window of the garage at the Minneapolis house. After the storm was over, petitioner found water damage to several double decker beds, an antique wicker table, other small pieces of furniture, and several pieces of clothing which she had stored in the garage. The 1953 and 1954 Federal income tax returns filed by petitioner and her husband were prepared by Everett Forsman of Virginia, Minnesota. Petitioner did not participate in the preparation of the returns but merely signed them. When petitioner's husband *166 retired it was necessary that she and her husband vacate the company house in which they lived in Hibbing. Because of her husband's physical condition, he was unable to assist her in moving their personal effects. Petitioner had most of their furniture and other personal effects placed in storage with the Security Transfer and Storage Company of Duluth, Minnesota, where these items remained until June of 1958 after her husband's death. When petitioner reclaimed the goods a number of items were missing. Petitioner had stored some records, including cancelled checks and bank statements, with these goods and these items as well as two barrels of dishes, two wardrobes of clothes, two small pieces of furniture, phonograph records, and books, could not be located when her goods were reclaimed. Petitioner, on the joint income tax returns filed with her husband for the years 1953 and 1954, claimed her two grandchildren, Billie Krecklow and Maudie Krecklow, as dependents. She claimed charitable contributions in the amount of $949.15 in 1953 and $1,049.20 in 1954. On the 1953 income tax return, petitioner showed as net medical expenses (not compensated by insurance or otherwise) $2,205.02 *167 which was reduced by the amount of $1,214.27 stated to represent 5 percent of gross income, and deducted $900.75 as medical expenses. On her 1954 joint income tax return, petitioner showed medical expenses other than medicine of $2,017.26, medicines of $570 reduced by 1 percent of gross income in the amount of $184.52, leaving a net of $385.48, making total medical expenses of $2,402.74. From this she deducted $553.55 stated to represent 3 percent of the gross income shown on the return, and she claimed an allowable deduction for medical expenses in the amount of $1,849.19. Petitioner, on her joint 1953 return deducted as casualty losses an amount of $275 designated as frost damage to front porch and an amount of $385 designated as water damage to paint. Respondent in his notice of deficiency disallowed the dependency credit exemptions claimed for Billie Krecklow and Maudie Krecklow in each of the years 1953 and 1954 with the explanation in each year that petitioner had not established her right to such exemptions. Respondent, for the year 1953, disallowed claimed deductions for charitable contributions in the amount of $463.45, medical expenses in the amount of $824.52, and casualty *168 losses in the amount of $660; and for the year 1954, disallowed claimed deductions for contributions in the amount of $672.26 and medical expenses in the amount of $872.61. For each of the years 1953 and 1954 respondent gave in explanation of his disallowance of a portion of the charitable contributions and medical expense deductions claimed that it had not been established that an amount in excess of the portions allowed by him represented deductible contributions or deductible medical expenses or were expended for the purpose designated. Respondent in explanation of his disallowance of the claimed casualty loss deduction in 1953 stated that petitioner had not established that she was entitled to such a deduction. Opinion The issues involved herein are entirely factual. Much of the testimony dealt with petitioner's personal difficulties during the years here involved and those immediately following, including the poor state of her husband's health during these years. No records were produced to support the claimed exemptions or any of the claimed deductions. None of the witnesses who testified had personal knowledge that such records ever existed other than their knowledge of *169 certain payments made by checks. Petitioner testified that she was certain her husband did at one time have records and that she believed he must have taken the records to the person who prepared their 1953 and 1954 income tax returns. She had no personal knowledge of this fact and stated that she, herself, took no part in the preparation of their income tax returns. Petitioner believed that the records were lost by the company with which her personal effects were stored since she knew that she had put some records into storage that were missing and thought the records in connection with her 1953 and 1954 income tax returns might have been among those lost. The only facts with respect to which any of the witnesses who testified at the trial had detailed personal knowledge were those in connection with the house furnished to Mary June and her two children, the money sent to Mary June by petitioner, the clothes supplied for Mary June and her two children, and the other sources of receipts of money or assistance by Mary June and the two children. From this testimony, we have found that the rental value of the house furnished to Mary June and her two children in each of the years 1953 *170 and 1954 was $1,500, that petitioner, in addition, supplied clothes for the two children of a value of $600 a year and sent Mary June, by checks, $1,200 in each year. We have also found that petitioner furnished clothes for Mary June and that the money sent to Mary June was for her use in her own support and the support of the children. The evidence shows that a portion of the money which petitioner sent to Mary June was used for repairs to or capital improvements on the house. If an accurate estimate of the part of the support of Billie and Maudie furnished by petitioner were to be made, the portion of the money so spent should be used as a reduction of the rental value of the house. However, since the evidence as a whole is totally inadequate to determine whether the support of Maudie and Billie furnished by petitioner was over one-half of their total support, no useful purpose would be served in attempting such an estimate. The evidence shows that a babysitter lived in the house with Mary June and her children. The babysitter looked after the children and also helped Mary June, presumably with the housework though this is not clear. The record does not show the ages of Maudie *171 and Billie in 1953 and 1954, but since one of the witnesses referred to the children's spending their vacation periods in these years with their paternal grandparents, they were apparently of school age which would indicate that the babysitter might have had a substantial portion of her time free in which to perform housework. Mary June, in her testimony, referred to the fact that she let the children visit their father's parents so she could save money to spend in the winter months and to the fact that she spent no money on the children's clothes because petitioner furnished the clothes, and when the children visited their father he gave them money. She also stated that the $100 a month paid to her by her former husband was solely for the support of the children according to the divorce decree, and she felt that she used it solely for that purpose. She stated that except for the minimum necessary for her own use, all of the funds she received were used for the support of the children. However, she stated that all of her funds were commingled and that she did not sort out the portion that went for herself as distinguished from that which was spent on the children. The evidence fails *172 to show the value of the clothes that petitioner gave to Mary June which amount, as well as the value of the children's trips to visit their paternal grandparents and the amount of any money given the children by their father, should be included in the amount of the overall family support. The evidence shows total cash funds available to Mary June in 1953 of $5,020.96 and in 1954 of $4,760.55. If to these amounts are added in each year $1,500 as rental value of the house and $600 as the value of clothing furnished by petitioner to the children, the totals are $7,120.96 in 1953 and $6,860.55 in 1954, of which on this basis, petitioner would have supplied $3,300 in each year. Since the support furnished by petitioner was for Mary June and for repairs and improvements to the house as well as for support of the children, the fact that the total amount furnished by petitioner was not one-half of the amount for support of the entire family to the extent that values have been placed on the various support items, indicates that petitioner did not furnish one-half of the children's support. There is no basis in the evidence for determining either the portion of the total overall expenses allocable *173 to the two children or the portion of the funds and the value of the house rental supplied by petitioner which should be so allocated. The house was occupied by four people including the babysitter. The allocation of the amounts spent for food and salary for the babysitter between support of the children and Mary June would depend upon what portion of the babysitter's time was spent in looking after the children to enable Mary June to work and what portion of her time was spent in otherwise assisting Mary June. The record furnishes no basis for such an allocation. Petitioner has failed to sustain her burden of showing that she contributed more than one-half of the support of Billie and Maudie Krecklow in 1953 or 1954. The testimony with respect to the charitable contributions made by petitioner and her husband is most general. Certainly, it shows that they contributed some amount of money to various churches and other charities. However, respondent has disallowed only $463.45 out of a claimed charitable contribution deduction of $949.15 in 1953 and has disallowed only $672.26 out of a similar claimed deduction of $1,049.20 in 1954, thus allowing charitable deductions of $485.70 in *174 1953 and $376.94 in 1954. The evidence totally fails to show that the contributions made by petitioner and her husband exceeded these amounts. The same factual situation exists with respect to the medical expense deductions. The amounts of medical expenses recognized by respondent are approximately $1,380.50 in 1953 and $1,529.93 in 1954, since these amounts result from adding the amount of the medical expense deductions allowed by respondent to the 5 percent and 3 percent of gross income deductions made on petitioner's returns in 1953 and 1954, respectively. While petitioner has shown that she and her husband incurred some medical expenses in 1953 and 1954, there is not a scintilla of evidence to show that the amounts of these expenses exceeded the amounts allowed by respondent. The parties on brief present some argument with respect to whether the damage to the steps of petitioner's house and to the goods stored in the garage resulted from a casualty. We need not pass on this issue since the record is totally devoid of any evidence to show the fair market value of any of the damaged property before or after the damage occurred. It is not unreasonable to assume that the fair *175 market value of an old house which was not in good repair would be unchanged by damage to the front proch steps and that the type of property petitioner referred to as being stored in the garage would have little if any fair market value prior to the water damage. Petitioner has failed to sustain her burden of proof with respect to the claimed casualty loss. Petitioner argues that the many unfortunate circumstances which led to her inability to produce at the trial any records to substantiate her claimed deductions should not prevent her from being entitled to such deductions. We think the evidence clearly shows that the failure to produce records was because of petitioner's inability to locate them and also shows that part of this inability to locate the records was occasioned by the fact that her husband handled these matters as long as he was physically able to do so during his lifetime. However, this does not relieve petitioner from producing evidence to support the claimed deductions. The fact that petitioner did not participate in the preparation of her joint income tax returns or in keeping any records during 1953 or 1954 but left these duties entirely to her husband, explains *176 why petitioner had no personal knowledge of the amounts actually given as contributions in 1953 or 1954 and the amounts actually paid as medical expenses in these years. However, petitioner has not by this explanation carried her burden of proving that the amounts of such contributions and expenses were in excess of those allowed by respondent. Decision will be entered for respondent.